IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| STEPHEN RULE, Personally, and as Administrator of the Estate of ROBIN PORTER, <br><br> Plaintiff, <br><br> vs. <br><br> E.I. DU PONT DE NEMOURS AND COMPANY and THE CHEMOURS COMPANY | Case No.: **2:23-cv-2123**_____ <br><br> **COMPLAINT FOR MONEY DAMAGES** <br> **(JURY DEMAND ENDORSED HEREON)** |

## COMPLAINT

Plaintiff, by and through the undersigned counsel, hereby bring this Complaint for damages against the Defendants, E. I. du Pont de Nemours and Company ("DuPont") and The Chemours Company ("Chemours")(collectively "Defendants"), named in the above styled matter, and allege the following:

### NATURE OF ACTION

1. This is a civil action for equitable relief, compensatory and punitive damages, costs incurred and to be incurred by Plaintiff, and any other damages which the Court or jury may deem appropriate for bodily injury and property damage arising from the intentional, knowing, reckless and negligent acts and omissions of the Defendants in connection with contamination of human drinking water supplies used by the Deceased Plaintiff, Robin Porter.

### JURISDICTION AND VENUE

2. DuPont is a Delaware corporation authorized to conduct business in the State of Ohio and has a principal place of business at 1007 Market Street, Wilmington, Delaware 19898 with a registered agent for service at 1209 Orange Street, Wilmington, Delaware 19801.

01727810-1

3. DuPont owned and operated a manufacturing facility in Wood County, West Virginia known as the "Washington Works Plant" until at least 2015. At all times thereto, DuPont was in control of the Washington Works Plant, the activities conducted at the facility, and all chemicals and/or emissions which were used and/or released from the facility.

4. Chemours is a Delaware corporation authorized to conduct business in the State of Ohio and has a principle place of business at 1007 Market Street, Wilmington, Delaware 19898 with a registered agent for service at 1209 Orange Street, Wilmington, Delaware 19801.

5. Chemours is a chemical company that was founded in July 2015 as a spin-off from DuPont and maintained control of DuPont's performance chemical divisions, including operations of the Washington Works Plant. At all times prior to this spin-off event, all operating elements of Chemours were bound by the covenants of the *Leach* class settlement agreement and at no point did DuPont, *Leach* class counsel, or any Court absolve the operating units held within Chemours from their inclusion in, and control by, the covenants of the *Leach* class settlement agreement. On or about February 13, 2017, Chemours and DuPont jointly announced that Chemours would annually pay the first $25 million of any potential future PFOA costs (after 2017) through at least 2022. If that amount is exceeded, DuPont will pay any additional amount up to $25 million, annually. These costs would include those C8 liabilities related to the present lawsuit.

6. At all times material hereto, Defendants each maintained systematic and continuous contacts in the state of Ohio, regularly transacted business within this state, and regularly availed itself of the benefits of this state. Additionally, Defendants collective and independent acts and/or omissions, as described herein, were substantially conducted within the state of Ohio and have caused tortious injury to Plaintiff as well as thousands of other Ohio residents and citizens.

7. This action is brought for individual claims of Deceased Plaintiff, Robin Porter, by and through her representative, Stephen Rule, who is Administrator for her Estate. At all relevant times of her *Leach* qualifying exposure, Plaintiff was a citizen of Belpre, Washington County, Ohio. Plaintiff's Administrator, Stephen Rule, is currently a citizen and resident of West Virginia.

8. This Court has jurisdiction over Defendants in this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

9. Further, Defendants committed torts in whole or in part against Plaintiffs in this State. As such, this Court has personal jurisdiction over all named defendants.

10. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## GENERAL ALLEGATIONS

11. In connection with its manufacturing operations at the Washington Works Plant, Defendants used hazardous, toxic and/or carcinogenic wastes, substances, pollutants and/or contaminants, including ammonium perfluorooctanoate (a/k/a C-8/FC-143/APFO/ DFS-2/PFOA) (hereinafter "C-8"), (collectively the "Materials") since the early 1950s.

12. C-8 is a toxic chemical used in the production of Teflon®. An artificial chemical, C-8 has been proven to be toxic and hazardous. It has been linked in some studies with prostate cancer, breast cancer, bladder cancer, liver disease, cholesterol, and possible birth defects. A U.S. Environmental Protection Agency advisory board determined in 2005 that C-8 "likely" causes cancer in humans.

13. During the course of its operations at its Washington Works Plant, Defendants have negligently, recklessly, knowingly, carelessly, wrongfully and/or intentionally allowed, caused, and/or otherwise permitted and is continuing to so allow, cause, and otherwise permit releases of Materials, from the Washington Works Plant into those waters that are and have been used for human drinking water purposes (the "Releases").

14. C-8 is a bioretentive substance.

15. C-8 is a bioaccumulative substance.

16. C-8 is a biopersistent substance.

17. C-8 is an animal carcinogen.

18. C-8 is a proven hazardous substance.

19. DuPont has established a "community exposure guideline" ("CEG") of 1 part per billion (1 ppb) for C-8 in public drinking water supplies for humans.

20. C-8 poses a risk to human health at a concentration of less than 1 ppb in water.

21. By at least 1984, DuPont had detected C-8 in water supplied for human consumption at levels exceeding 1 ppb.

22. By 1991, DuPont had detected C-8 in water obtained from local wells and in groundwater and surface waters otherwise impacted by the Releases at levels exceeding 1 ppb.

23. DuPont negligently, recklessly, carelessly, wrongfully, and/or intentionally failed to disclose to those other individuals who were using water impacted by the Releases that the levels of C-8 detected in the water exceeded DuPont's own internal CEG for C-8 in drinking water.

24. By at least May of 2000, DuPont had learned that the manufacturer of the C-8 used by DuPont at its Washington Works Plant, the Minnesota Mining and Manufacturing Company

("3M"), had decided to stop manufacturing and selling C-8, based upon concerns associated with the bio-persistence and relative toxicity of C-8.

25. By at least 2001, DuPont had learned that C-8 had been detected in private water wells hydraulically down-gradient from one or more of the locations where DuPont had dumped C-8 into the ground, including DuPont's Dry Run Landfill in Wood County, West Virginia, and DuPont's Letart Landfill in Mason County, West Virginia.

26. Despite knowledge of the same bio-persistence and toxicity concerns known to 3M relating to the use of C-8 and its release into the environment and the fact that C-8 was getting into public and private human drinking water supplies, DuPont refused to stop using C-8 or releasing C-8 into the environment and now planned to begin direct manufacture of its own C-8 at the Washington Works Plant.

27. DuPont knew for several years that the C-8 being discharged from its Washington Works Plant, and discharge of C-8 into the Ohio River, was directly contributing to the levels of C-8 found in local human water supplies.

28. Two West Virginia water districts and four Ohio water districts turned out to be the most contaminated by C-8. These districts were: (1) Little Hocking, Ohio; (2) Lubeck Public Service District, West Virginia; (3) City of Belpre, Ohio; (4) Mason County Public Service District, West Virginia; (5) Tuppers Plains, Ohio; (6) Village of Pomeroy, Ohio.

29. DuPont knew for several years that the level of C-8 discharged from its Washington Works Plant could be reduced substantially by use of a carbon absorption treatment system at the Washington Works Plant.

30. DuPont took steps to purposely and intentionally conceal from the public the fact that C-8 had been detected in the human drinking water supplies at levels exceeding DuPont's 1 ppb CEG for C-8 in drinking water, including purposeful and intentional omissions of any

5

reference to such test results when specifically asked about C-8 levels by members of the Parkersburg, West Virginia media and in a letter co-drafted by DuPont which was sent to local Ohio water customers, dated October 31, 2000.

31. It was not until the Spring of 2001, after the West Virginia Division for Environmental Protection ("WVDEP") first asked DuPont to begin monitoring and reporting to WVDEP the levels of C-8 discharged from DuPont's Washington Works Plant into the Ohio River, that DuPont installed a carbon absorption treatment system at its Washington Works Plant to attempt to begin reducing the levels of C-8 discharged directly from the Washington Works Plant into the Ohio River.

32. Since approximately 1979, DuPont had arranged and paid for medical monitoring, including periodic blood sampling, of those DuPont employees working at the Washington Works Plant who had been exposed to C-8 during the course of their employment at the Washington Works Plant.

33. At no time since C-8 was first detected in human drinking water had DuPont provided or paid for medical monitoring for the water customers known to be exposed to the probable C-8 exposure plume until after a class action settlement was reached in the *Leach v. E.I. DuPont* matter.

34. Effective December 1, 2006, the Ohio EPA listed C-8 as a toxic air contaminant.

35. In a March 2009 US Environmental Protection Agency ("EPA") Safe Drinking Water Act Consent Order with DuPont, the EPA determined that C-8 may present an "imminent and substantial endangerment to human health at concentrations at or above 0.40 ppb in drinking water." The levels from DuPont's own testing demonstrated C-8 levels in excess of this amount had emanated from its Washington Works facility.

36. The 0.40 ppb danger level expressed by EPA does not account for chronic exposure to C-8. In an effort to account for chronic lifetime exposure, independent researchers at the New Jersey Department of Environmental Protection identified a C-8 drinking water guidance value of 0.04 ppb, and entire order of magnitude, ten times lower, than the level set forth in the March 2009 Safe Drinking Water Act consent order and over twenty five times lower than DuPont's own testing demonstrated C-8 levels emanating from its Washington Works facility to be.

37. The United States EPA has found that C-8 can remain in the human body for years after initial exposure and that drinking water contaminated with C-8 can produce concentrations of C-8 in the blood serum that are higher than the concentrations present in the water itself.

38. In a 2003 C-8 related class action lawsuit ("class action") where DuPont was a named defendant:

> DuPont represented to the Court that there was no way for DuPont to prevent its C-8 emissions from getting into the class members' drinking water;
>
> DuPont represented to the Court that there were no alternatives to using C-8 in the Washington Works Plant's manufacturing operations; and
>
> The Court found that DuPont was continuing to actively and intentionally release C-8 from the Washington Works Plant into the air and water.

39. On October 18, 2006, a settlement to the class action was approved.

40. Part of the class action settlement created an independent Science Panel to conduct research into whether there is a probable link that exists between C-8 and human diseases.

41. On December 5, 2011, the Science Panel concluded there was a probable link between C-8 exposure and pregnancy induced hypertension.

42. On April 15, 2012, the Science Panel concluded there was a probable link between C-8 exposure and kidney cancer.

43. On April 15, 2012, the Science Panel concluded there was a probable link between C-8 exposure and testicular cancer.

44. On July 30, 2012, the Science Panel concluded there was a probable link between C-8 exposure and thyroid disease.

45. On July 30, 2012, the Science Panel concluded there was a probable link between C-8 exposure and ulcerative colitis.

46. On October 29, 2012, the Science Panel concluded there was a probable link between C-8 exposure and high cholesterol.

47. As part of the class action settlement, DuPont affirmatively agreed that any individual who was exposed to potentially C-8 contaminated drinking water, for at least one year prior to December 3, 2004, from any of six water districts ((1) Little Hocking, Ohio; (2) Lubeck Public Service District, West Virginia; (3) City of Belpre, Ohio; (4) Mason County Public Service District, West Virginia; (5) Tuppers Plains, Ohio; (6) Village of Pomeroy, Ohio would be members of the class at issue in the settlement.

48. Any class member who was diagnosed with an injury for which the Science Panel had determined there was a probable link to C-8 exposure would be able to pursue an independent cause of action following the Science Panel's finding.

49. DuPont further agreed to and acknowledged that it has waived and would be unable to raise any general causation defense to the fact that a Science Panel determined probable link could in fact be caused by the C-8 contamination released from its Washington Works Plant.

50. Plaintiff was diagnosed with Kidney Cancer, an injury for which the Science Panel has issued a C-8 exposure probable link finding.

51. Plaintiff's diagnosed Kidney Cancer was a direct and proximate cause of her death.

52. Plaintiff was exposed to potential C-8 contamination for at least a year prior to December 3, 2004, from at least one of the 6 designated water districts as outlined in the class action settlement.

53. The Releases have made and/or continue to make Plaintiff and other exposed individuals physically ill and otherwise physically harmed, and/or have caused and continue to cause associated emotional and mental stress, anxiety, and fear of current and future illnesses, including but not limited to, fear of significantly increased risk of cancer and other disease, among Plaintiff and the other class members.

## FIRST COUNT
## BREACH OF DUTY, NEGLIGENCE, CONCEALMENT, MISREPRESENTATION, AND FRAUD

54. Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

55. In connection with its operation of the Washington Works Plant, Defendants have had and continue to have a duty to operate and manage the Washington Works Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

56. Defendants breached this duty of care by negligently operating and managing the Washington Works Plant and conducting other operations and activities at the Washington Works Plant in such a manner as to negligently cause, permit, and allow the Releases.

57. Defendants' negligent acts and omissions proximately caused and continue to proximately cause damage to Plaintiff in the form of bodily injury and economic damage, in addition to creating conditions that are harmful to human health and the environment, for which the Defendants are liable.

58. Defendants knowingly, intentionally, recklessly and/or negligently failed and/or refused to advise the Plaintiff, other exposed individuals, and the public at large of the dangers to their health and property posed by the Releases.

59. Defendants negligently, knowingly, recklessly and/or intentionally withheld, misrepresented, and/or concealed information from the Plaintiff, other exposed individuals, and the public at large who had a right to know of information which would have prevented the Plaintiff, other exposed individuals, and the public at large from being exposed to the Releases.

60. Plaintiff did not have sufficient information to determine the safety of the drinking water impacted by the Releases and, therefore, relied upon the superior knowledge of Defendants in deciding to purchase and ingest the drinking water, and, as a result of Plaintiff's reliance on Defendants' false and misleading affirmative misrepresentations and intentional omissions and hiding of relevant, significant and material facts and information, the Plaintiff, other exposed individuals, and the public at large were misled into believing the drinking water was safe and effective for human consumption.

61. Defendants withheld information which it had in its possession concerning research, testing, lack of research and testing, studies of humans and animals who had been exposed to C-8 that demonstrated that the Releases cause damage to humans and animals, as well as other information that medically, legally, scientifically and ethically the Plaintiff, other exposed individuals, and the public at large had a right to know before ingesting the drinking water and which DuPont had a duty under Ohio law to disclose.

62. As a proximate result of the aforesaid acts and omissions by Defendants, acting for and on its own behalf and as agent, ostensible agent, employee, and conspirator of others, contaminated drinking water was placed in the stream of commerce, distributed and sold to customers

10

in West Virginia and Ohio, and ingested by the Plaintiff, other exposed individuals, and the public at large, and Plaintiff was injured as herein alleged.

63. The aforesaid acts and omissions of Defendants were negligent and as a proximate result the Plaintiff, other exposed individuals, and the public at large have suffered and will in the future suffer some or all of the following damages:

    a.    Medical and hospital bills treatment of injuries;
    b.    Physical injury, both temporary and permanent;
    c.    Economic damages;
    d.    Severe and significant emotional distress and mental pain and suffering;
    e.    Humiliation, embarrassment and fear;
    f.    Loss of enjoyment of life;
    g.    Annoyance and inconvenience; and
    h.    Other damages, which, under the law and circumstances, Plaintiff are entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

## SECOND COUNT
## PUNITIVE DAMAGES

64. Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

65. Defendants' acts and omissions as described above were conducted with such intentional, malicious, wanton, willful, grossly negligent, and/or reckless indifference to the rights of Plaintiff, other exposed individuals, and the public at large that Defendants are liable for punitive damages.

66. Defendants' acts and omissions as described above were conducted with such flagrant disregard for the safety and wellbeing of Plaintiff, other exposed individuals, and the public at large that Defendants are liable for punitive damages.

## THIRD COUNT
## WRONGFUL DEATH

70. Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

71. As a direct and proximate result of Defendant's negligence and otherwise culpable acts described herein, Decedent Plaintiff Robin Porter was exposed to C-8 contamination which caused her to sustain injuries and damages outlined herein that resulted in her death.

72. Decedent Plaintiff's injuries and death as alleged more fully in the allegations herein directly resulted from Defendant's negligent and otherwise culpable acts, omissions, and/or misrepresentations.

## FOURTH COUNT
## CONSCIOUS PAIN AND SUFFERING

73. Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

74. As a direct and proximate result of the going, combined and concurrent negligence and/or wrongful conduct of the Defendants, for a period of time leading up to her premature death, Decedent Plaintiff sustained a conscious pain and suffering, an inability to engage in usual activities, expenses for medical care and treatment, and potential lost wages.

**WHEREFORE**, Plaintiff hereby demands to be awarded damages, equitable and injunctive relief as follows:

- a. A judgment against Defendants that Defendants are liable to Plaintiff in an amount to be determined at trial;
- b. Compensatory damages in an amount to be determined at trial;
- c. Punitive damages in an amount to be determined at trial;
- d. Damages including equitable and injunctive relief;
- e. The costs and disbursements of this action, including attorneys' fees;
- f. Pre-judgment and post-judgment interest; and

g.     For all other further and general relief, whether compensatory, punitive, equitable or injunctive relief as this Court or the jury may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demand trial by jury on all issues so triable.

Date: July 3, 2023

By:    /s/ *Jon Conlin*
        Jon C. Conlin
        F. Jerome Tapley
        Mitchell Theodore
        Brett Thompson
        CORY WATSON, P.C.
        2131 Magnolia Ave., Suite 200
        Birmingham, AL 35205
        Telephone:  205-328-2200
        Fax:  205-324-7896
        jconlin@corywatson.com
        jtapley@corywatson.com
        mtheodore@corywatson.com
        bthompson@corywatson.com

        */s/ Richard W. Schulte*
        Richard W. Schulte (OH Bar # 0066031)
        WRIGHT & SCHULTE, LLC
        865 S. Dixie Dr.
        Vandalia, OH 45377
        Tel: (937) 435-7500
        Fax: (937) 435-7511
        rschulte@yourlegalhelp.com

        *Attorneys for Plaintiff*